UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUAN A. SCOTT,<br><br>         Plaintiff,<br><br>             v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>         Defendant. | Civil Action No. 10-1757 (JEB) |

**MEMORANDUM OPINION**

Plaintiff Juan A. Scott brings this *pro se* action seeking reversal of the decision made by the Commissioner of Social Security that he is not disabled under the Social Security Act, 42 U.S.C. §§ 1381-1383, and therefore not entitled to supplemental security income (SSI). Although Plaintiff never mentions 42 U.S.C. § 405(g), Defendant correctly points out that this must be the basis for his suit. See Mot. at 1 n.1. As the Court finds that substantial evidence supports the Commissioner's decision, it will grant Defendant's Motion for Judgment of Affirmance.

**I.    Background**

   A. Factual Background

Plaintiff is a 53-year-old man with a high school education and no vocational training. Administrative Record (AR) at 87, 108. From 1990 to 1991, he worked in a warehouse with the Metropolitan Police Department performing duties such as driving a forklift, receiving supplies, lifting boxes, and driving a bus. Id. at 105. According to Plaintiff, on March 11, 1991, he was involved in a work-related accident that resulted in a "herniated disk, spine [and] neck problems,

1

[a] bad hip, chron[ic] migraine[s], [and] heart problems." Id. at 104-05, 657-59.  Multiple examinations by a bevy of medical practitioners over the course of many years have revealed that Plaintiff indeed suffers from both physical and mental infirmities, some stemming from his 1991 accident.  Given the remarkable number of doctors who have examined or treated Plaintiff, what follows is not an exhaustive list of all doctors or medical opinions in the eighteen years between Plaintiff's accident and the October 20, 2009, decision to deny his SSI application.  Instead, the Court summarizes the most salient ones.

*1. Physical Difficulties*

From March 1991 to at least November 2009, Plaintiff was examined intermittently by internist Dr. Charles F. Colao.  During what appear to be regular medical visits that began after the 1991 accident and lasted until 1993, Colao noted tenderness, pain, and limited range of motion in Plaintiff's neck and lower back, id. at 168-93, but he nevertheless did not recommend surgery because he observed no herniated disks.  Id. at 185.  Colao also repeatedly opined that Plaintiff was disabled and recommended light physical duty.  Id. at 168-93.

During later examinations conducted by Colao between 2002 and 2009, Plaintiff was again diagnosed with cervical and lumbar spine disorders.  Id. at 169-70, 275-76 (2002 examinations), 277-78 (2003 examination), 392-93 (2006 examination), 420-21 (2007 examination), 425 (2008 examination), 624 (2009 examination).  According to Colao, Plaintiff had radiculopathy in his extremities (noted in 2009, 2008, 2007, 2006, and 2002 examinations); bulging and herniated disks (2006, 2003, and 2002); flattening of the spinal cord (2006); "mild to moderate" spinal stenosis (2006 and 2002); muscle atrophy and weakness in his extremities (2009, 2007, 2006, and 2002); tenderness in his lumbar spine (2009, 2008, 2007, and 2003); chronic headaches (2009, 2007, and 2006); and difficulty with walking, bending, squatting, and

touching his toes (2007, 2006, and 2002). Id. at 169-70, 275-76, 277-78, 392-93, 420-21, 425, 624. Colao also stated at different times that he believed Plaintiff was disabled. Id. at 170, 425, 624 (in 2009, 2008, and 2002, Plaintiff was "disabled for work"); id. at 393 (in 2006, Plaintiff was "permanently and totally disabled"); id. at 421 (in 2007, Plaintiff was "disabled for his occupation and for all work").

Other doctors appear to have arrived at different conclusions regarding the extent of Plaintiff's physical impairments. For instance, in a November 22, 2004, examination, internist Dr. Elliot Aleskow noted that Plaintiff "[had] limitation of range of motion of the cervical spine and lumbosacral spine region. Plain x-rays," however, "[did] not reveal significant abnormalities in the lumbosacral or cervical spine region." Id. at 325-26. Additionally, Plaintiff "had good strength in all four extremities," and "[t]here was no evidence of muscle wasting." Id. at 326. Another examination of Plaintiff by Dr. Aleskow three years later yielded identical results. See id. at 394-404 (November 18, 2007, examination). Again, an x-ray revealed "no fractures, dislocations or other bony abnormalities" in either the cervical or lumbosacral spine regions. Id. at 397. In the 2007 report, Dr. Aleskow also added that Plaintiff was "able to transfer without any difficulty and ambulate about the office without any difficulty," but "had some mild difficulties with some fine motor skills of the hands." Id. at 396-97.

In a March 14, 2007, consultative examination, neurologist Dr. Chitra R. Chari concluded that Plaintiff's "neurologic examination [was] essentially normal." Id. at 410. Dr. Chari also found "no atrophy in any of the muscle groups," stated that Plaintiff had "4+ to 5/5 strength in all 4 limbs," and observed that Plaintiff "took his shoes and socks off by himself and . . . could get on and off the examination table without assistance." Id. at 409.

3

On April 16, 2003, Plaintiff was also examined by Dr. Eugene Miknowski. Id. at 289-96. Dr. Miknowski reported that Plaintiff had "decreased range of motion in his lumbar spine, both shoulders, cervical spine and hips." Id. at 291. X-rays of the cervical spine, however, revealed that there was "no evidence of fracture," and the cervical vertebrae were "mostly unremarkable [in] appearance." Id. A "lumbar spine x-ray also demonstrated no fractures" and was "normal." Id. Dr. Miknowski then added: "Considering [Plaintiff's] chronic pain, he is not recommended for heavy lifting, pushing or pulling – mild to moderate [work-related activities] do not appear to be restricted. Walking is mildly restricted. Standing or sitting are not restricted. Hearing, speaking, and hand manipulation are not restricted." Id. at 292.

Among the many other medical practitioners who have also examined Plaintiff was neurological surgeon Dr. George J. Mathews, whose medical findings are conveyed in an August 28, 2003, report. Id. at 423. During his consultative examination, Mathews interpreted Plaintiff's MRI from April 27, 1999. Id. Consistent with an earlier, contemporaneous interpretation of that MRI, see id. at 232-33, Mathews found in Plaintiff's cervical spine evidence of disk herniation, spinal stenosis, and spinal cord compression, but no nerve root compression. Id. at 423. Plaintiff's lumbar spine, on the other hand, was "normal except for some physiological protrusion of the lumbar discs." Id. Mathews nonetheless concluded that Plaintiff was "totally and permanently disabled." Id.

Finally, two separate physicians from Disability Determination Services (DDS) also arrived at conclusions regarding Plaintiff's physical limitations similar to the findings of Drs. Aleskow, Chari, and Miknowski. On December 29, 2004, and again on March 26, 2007, DDS physicians, relying in large part on Plaintiff's medical records, concluded that Plaintiff could occasionally lift twenty pounds, could frequently lift ten pounds, and could stand, walk, or sit for

six hours in an eight-hour workday. See id. at 334, 413. Plaintiff, however, was limited in his ability to push or pull with his extremities and had some postural limitations such as the ability to climb ladders, ropes, and scaffolds. See id. at 334-35, 413-14. A face-to-face interview with Plaintiff by an interviewer from the Social Security Administration also revealed no limitations in Plaintiff's hearing, reading, breathing, understanding, concentrating, talking, answering, sitting, standing, walking, seeing, using of hands, or writing. See id. at 111.

   2. *Mental Difficulties*

In addition to physical difficulties, a number of doctors have also diagnosed Plaintiff with mental difficulties. From as early as August 11, 2004, Plaintiff began receiving mental health care from the Scruples Corporation. See id. at 318-23, 341-43, 427-622. Although he was never hospitalized, Plaintiff was diagnosed with depression and prescribed medication. See id. at 341-42, 364-65, 614-19, 660-61. In a 2006 comprehensive psychiatric evaluation at the Scruples Corporation, Plaintiff was noted by psychiatrist Dr. Amir Rehman to be in stable condition. Id. at 364; see also id. at 448, 555, 558, 561, 564, 586 (Plaintiff was at different times in 2005 and 2006 "psychiatrically stable"). Plaintiff also "report[ed] progressive improvements [in his depression], and denie[d] any major side effects." Id. at 364. Although Plaintiff had poor impulse control, id. at 342, and occasional anxiety and irritability, id. at 620, 660-61, there was no evidence of suicidal or homicidal ideations, id. at 319, or auditory and visual hallucinations. Id. at 341.

Three DDS physicians also reached similar conclusions regarding Plaintiff's mental impairments. See id. at 300-17, 346-63, 368-85. On July 16, 2003, the first Mental Residual Functional Capacity Assessment ("RFC mental assessment") of Plaintiff concluded that he was moderately limited in four areas of mental activity: 1) "ability to maintain attention and

concentration for extended periods"; 2) "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; 3) "ability to complete a normal work-day and workweek without [psychologically-based] interruptions"; and 4) "ability to accept instructions and respond appropriately to criticism from supervisors." Id. at 300-01. Plaintiff was then found to be mildly limited in "Activities of Daily Living" and "Social Functioning," moderately limited in "Maintaining Concentration, Persistence, or Pace," and had experienced no episodes of decompensation of extended duration. Id. at 314. The second RFC mental assessment conducted by another physician on February 2, 2005, reached virtually the same conclusions. See id. at 346-47. On September 22, 2006, the third RFC mental assessment of Plaintiff by yet another DDS physician added that Plaintiff was also moderately limited in the "ability to understand and remember detailed instructions," id. at 368, moderately – rather than mildly – limited in "Activities of Daily Living" and "Social Functioning," and had experienced one or two episodes of decompensation of extended duration. Id. at 382.

    B.  Procedural Background

The record shows that Plaintiff has spent the past decade – and perhaps more – either applying for SSI benefits for his 1991 accident or appealing denials of those applications. See AR at 83-86 (2002 SSI application); Supplemental Complaint at 2-3 (reference to a 1999 appeal). Before the Court is his most recent application filed on April 27, 2004, in which he, again, sought SSI benefits for his 1991 accident. AR at 87-90.

Plaintiff's application was first denied in a letter dated February 4, 2005, and again on reconsideration in a letter dated March 29, 2007. Id. at 72-78. Represented by counsel, he then sought and received a hearing before an Administrative Law Judge. Id. at 58, 626-46. The outcome was no better. On March 31, 2008, the ALJ issued a decision denying Plaintiff's

application on the basis that he could perform a range of "light exertional work," significant opportunities for which were available in the national economy. Id. at 41-53. Upon appeal, the Social Security Administration's Appeals Council vacated and remanded the decision with instructions to: (1) "evaluate the treating and examining source opinions . . . and explain the weight given to such opinion[s]"; (2) "[f]urther evaluate the [Plaintiff's] subjective complaints"; (3) "[e]valuate the other source opinions"; and (4) "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base." Id. at 35. A second hearing was held on August 6, 2009, in which a new ALJ heard testimony from a vocational expert and from Plaintiff, who was again represented by counsel. Id. at 647-83. On remand, the ALJ issued yet another denial of Plaintiff's application in an opinion dated October 20, 2009. Id. at 15-31. The Appeals Council denied Plaintiff's request for review, making the second ALJ's decision the Commissioner's final one. Id. at 7-9. Plaintiff subsequently brought this suit challenging the Commissioner's final decision.

**II.     Legal Standard**

The Social Security Act gives federal district courts the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A reviewing court, however, must affirm the decision of the Commissioner if it is based on substantial evidence in the record and the correct application of the relevant legal standards. Id.; Butler v. Barnhart, 353 F.3d 992, 999 (D.C. Cir. 2004); Brown v. Bowen, 794 F.2d 703, 705 (D.C. Cir. 1986). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Brown, 794 F.2d at 705 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The test "'requires more than a scintilla, but

can be satisfied by something less than a preponderance of the evidence.'" Butler, 353 F.3d at 999 (quoting Fla. Mun. Power Agency v. FERC, 315 F.3d 362, 365-66 (D.C. Cir. 2003)). Finally, determining whether the Commissioner's decision is supported by substantial evidence and free of legal error requires the court to "carefully scrutinize the entire record." Davis v. Heckler, 566 F. Supp. 1193, 1195 (D.D.C. 1983); see also Butler, 353 F.3d at 999. In doing so, however, the court must not "replace the [Commissioner's] judgment concerning the weight and validity of the evidence with its own." Davis, 566 F. Supp. at 1195.

**III.     Analysis**

Although Plaintiff's *pro se* submissions to the Court fall woefully short of advancing his cause, a generous reading of those submissions reveals two implicit arguments for reversing the Commissioner's decision. First, Plaintiff can be said to assert a general claim that the Commissioner somehow and somewhere erred in his disability determination. See Compl. at 2-3. Even though Plaintiff bases his claim on the fact that the case "was remanded back to the ALJ to correct the findings in his decision," see id., the Court will, of course, review the decision made after remand.[1] Second, Plaintiff appears to argue that the presence of new and material evidence warrants remand. See Supp. Compl. at 1. Plaintiff's arguments, such as they are, will be addressed in turn.

    A.   The Commissioner's Disability Determination

To qualify for supplemental security income under the Social Security Act, a claimant must establish that he is "disabled." 42 U.S.C. § 1382(a)(1). Plaintiff's objective here – as it seems to have been since he was injured twenty-one years ago – is to be declared disabled and

---

[1] Plaintiff also raises claims – at least he believes he does – against his former attorneys, Scott Elkind and Steven Shea, and the CEOs of the Scruples Corporation, Mr. and Mrs. Sharon Yorke Cyrus. Compl. at 2-3. As he does not name them as defendants, the Court is powerless to act on these purported claims.

8

thereby qualify to obtain SSI benefits. By all accounts, Plaintiff indeed suffers from at least some physical and mental problems. That conclusion, however, is by no means sufficient to render him legally disabled under the Act.

An individual is considered "disabled" if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id. § 1382c(a)(3)(A). Additionally, an individual can be determined to be under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining a claimant's purported disability. See 20 C.F.R. § 416.920. First, the claimant must show that he is not presently engaged in a "substantial gainful activity." Id. § 416.920(a)(4)(i). If he is engaged in such activity, the claimant is conclusively not disabled regardless of his medical condition, age, education, and work experience. Id. § 416.920(b). Second, a claimant must show that he has a "severe medically determinable physical or mental impairment." Id. § 416.920(a)(4)(ii). Such impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." Id. § 416.920(c). Third, the claimant must show that his impairment meets or equals an impairment listed in Appendix 1 to the Commissioner's regulations. Id. § 416.920(a)(4)(iii). If the claimant's impairment is listed, then he is conclusively presumed disabled and the inquiry ends. Id. § 416.920(d). If the impairment is not listed, the Commissioner moves on to the next step, but must first determine the claimant's

9

residual functional capacity ("RFC"), id. § 416.920(e), which reflects "what an individual can still do despite his or her limitations." Ross v. Astrue, 636 F. Supp. 2d 127, 132 (D.D.C. 2009). Fourth, the claimant must show, based on the RFC, that his impairment prevents him from performing his "past relevant work." 20 C.F.R. § 416.920(a)(4)(iv). Fifth, once the claimant has met the burden of proof at the first four steps, the burden shifts to the Commissioner at the last step to show that the claimant is capable of "mak[ing] an adjustment to other work" based on his RFC, age, education, and work experience. Id. § 416.920(a)(4)(v); Butler, 353 F.3d at 997 ("The claimant carries the burden of proof on the first four steps.").

Here, the ALJ on remand arrived at findings favorable to Plaintiff at steps one and two: Plaintiff was not engaged in substantial gainful activity and had severe medical impairments. AR at 21. The ALJ, however, made findings adverse to Plaintiff at step three, the RFC determination, step four, and step five. As such, the Court shall only address those specific findings, and it shall do so bearing in mind that a court's role when reviewing the Commissioner's disability decisions is "not to determine . . . whether [Plaintiff] is disabled," but to "assess only whether the ALJ's finding that [Plaintiff] is not is based on substantial evidence and a correct application of the law." Butler, 353 F.3d at 999.

   *1. The Step-Three Determination*

Plaintiff failed to meet his burden of proving that either his physical or mental impairments meet or equal any of those listed in Appendix 1. With respect to Plaintiff's physical impairments, the ALJ considered Listing 1.04, which deals with disorders of the spine. AR at 21-22. That listing provides in relevant part that in order to render a person disabled, disorders of the spine must "result[] in compromise of a nerve root . . . or the spinal cord" and must include:

> A. <u>Evidence of nerve root compression</u> characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in <u>inability to ambulate effectively</u>, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (emphasis added).[2] Listing 1.00B2b then defines the "inability to ambulate effectively" as:

> [A]n <u>extreme limitation of the ability to walk</u>; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

<u>Id.</u> § 1.00B2b(1) (emphasis added). Although Plaintiff's physical impairments satisfy some of the conditions of Listing 1.04, "'for a claimant to show that his impairment matches a listing, it must meet <u>all</u> of the specified medical criteria.'" <u>Beynum v. Barnhart</u>, 435 F. Supp. 2d 142, 146 (D.D.C. 2006) (emphasis added) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 529 (1990)). When an impairment "manifests only some of [the] criteria [of a Listing], no matter how severely, [it] does not qualify." <u>Id.</u>

As the ALJ points out, AR at 22, the record does not show any evidence of nerve root compression in either Plaintiff's cervical or lumbar spine, a requirement of Listing 1.04A. <u>See</u> <u>id.</u> at 194-95, 198, 199-200, 205-06, 220-21, 232-33, 423 (MRIs taken at different times and interpreted by different doctors showing no nerve root compression). The ALJ also points out,

---

[2] Listing 1.04 also contains a B section that has been omitted as it requires a diagnosis of spinal arachnoiditis, a condition that Plaintiff has never been diagnosed with.

id. at 22, that there is evidence that Plaintiff maintains the ability to ambulate effectively, which removes his impairment from Listing 1.04C. See, e.g., id. at 396-97 (Dr. Aleskow noted Plaintiff was "able to transfer without any difficulty and ambulate about the office without any difficulty"); id., at 409 (Dr. Chari noted "no atrophy in any of [Plaintiff's] muscle groups," Plaintiff had "4+ to 5/5 strength in all 4 limbs," and he "could get on and off the examination table without assistance"). Because examining physicians noted that Plaintiff had significant strength in his limbs and could ambulate without difficulty, there was evidence he did not have the kind of "extreme limitation of the ability to walk" required for his impairment to meet Listing 1.04C. The ALJ's determination that Plaintiff's physical impairment does not match Listings 1.04A or 1.04C is thus well grounded in substantial evidence found in the record and may not be disturbed.

With respect to Plaintiff's mental impairments, the ALJ considered Listing 12.04, which deals with mood disorders. AR at 22. The ALJ was also supported by substantial evidence in the record when he determined that Plaintiff's mental impairments did not satisfy Listing 12.04. That Listing requires a plaintiff to prove at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. None is present here. All three DDS physicians who examined Plaintiff noted that he had mild or moderate limitations in a number of functional areas but no marked limitations. See AR at 300-17, 346-63, 368-85. Plaintiff also had at most one or two episodes of decompensation. Id. at 314, 360, 382. The Commissioner's determination was thus based on substantial evidence.

    2. *The RFC Determination*

Substantial evidence also supports the ALJ's conclusion that Plaintiff's RFC rendered him capable of performing "a full range of light exertional work, and alternatively sedentary exertional work." Id. at 23. A "full range of light work" involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities.

20 C.F.R. § 416.967(b). Sedentary work, on the other hand, involves

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

Id. § 416.967(a).

In making his determination that Plaintiff could perform either light or sedentary work, the ALJ relied on the medical conclusions of Drs. Aleskow, Chari, Miknowski, and the two DDS physicians who assessed Plaintiff's RFC. See AR at 23-29. The Court will focus on whether substantial evidence supports the ALJ's determination that Plaintiff can do light work because "if someone can do light work . . . [then] he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967(b).

The five doctors mentioned above examined Plaintiff at different times and for different reasons, but they are consistent in one thing: Plaintiff retains the capacity to do the kind of light work spelled out in § 416.967(b). Miknowski, for instance, concluded that although Plaintiff

13

could not lift heavy objects and was "mildly restricted" in his walking, he was nonetheless capable of "mild to moderate" work-related activities and could stand, sit, hear, speak, and manipulate his hands without restriction. See AR at 292. Aleskow concluded that Plaintiff "had good strength in all four extremities" with "no evidence of muscle wasting," id. at 326, and was "able to transfer without any difficulty and ambulate about the office without any difficulty." Id. at 396. Similarly, Chari concluded that Plaintiff exhibited no muscle atrophy, had good strength in all his extremities, and could "get on and off the examination table without assistance." Id. at 409. Consistent with Drs. Miknowski, Aleskow, and Chari, the DDS physicians also concluded that Plaintiff was capable of occasionally lifting twenty pounds and frequently lifting ten pounds and that he could stand, walk, or sit for six hours in an eight-hour workday. See id. at 334, 413. In light of all this evidence that the ALJ identified, Plaintiff cannot question whether there was substantial evidence to support the determination that he could perform light work.

To be sure, the ALJ's RFC determination does appear to contradict the conclusions of Plaintiff's treating physician, Dr. Colao, who stated repeatedly that Plaintiff was significantly physically limited and therefore disabled. See id. at 170, 393, 421, 425, 624; see also id. at 423 (non-treating physician Dr. Mathews's conclusion that Plaintiff was "totally and permanently disabled"). The ALJ acknowledged Colao's opinion, but did not find it controlling. Id. at 26, 29. In this circuit, "'[b]ecause a claimant's treating physicians have great familiarity with [his] condition, their reports must be accorded substantial weight.'" Butler, 353 F.3d at 1003 (quoting Williams v. Shalala, 997 F.2d 1494, 1498 (D.C. Cir. 1993)); see also 20 C.F.R. § 404.1527(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will

give it controlling weight."). Where substantial evidence contradicts the treating physician's opinions, an ALJ may reject them, but must explain why he does so. Jones v. Astrue, 647 F.3d 350, 355 (D.C. Cir. 2011); Butler, 353 F.3d at 1003. In keeping with this treating-physician rule, the Appeals Council's instructions to the ALJ on remand required him to "evaluate the treating and examining source opinions . . . and explain the weight given to such opinion[s]." AR at 35. The ALJ did as required.

To the extent that the ALJ's RFC finding that Plaintiff could perform light work was inconsistent with Colao's opinion, the ALJ gave adequate bases for why he disregarded that opinion. In Williams, 997 F.2d at 1498-99, the court found it acceptable for an ALJ to decline to defer to a treating physician's opinion because the ALJ identified contradictory evidence in the record for doing so: "In view of the contradictory evidence in the record, we think that the ALJ did not err in failing to defer to [the treating physician's] diagnosis under the treating physician rule." Id. Specifically, the ALJ there relied on contradictory evidence from another physician as well as the treating physician's own earlier inconsistent opinions. Id. Here, similarly, the ALJ identified substantial contradictory evidence in the record for disregarding the treating physician's opinion. See AR at 29. The ALJ pointed out that Colao's opinion was not consistent with the opinions of Aleskow or Miknowski. See id. The ALJ, moreover, added that "other medical evidence in the file" – for example, Plaintiff's x-rays and several other doctors' opinions – are also inconsistent with Colao's opinion. See id. The ALJ thus fulfilled his obligation to evaluate the treating physician's opinion and adequately explained why he disregarded it.

It is worth noting, finally, that it is not absolutely clear that Colao's opinion on the severity of Plaintiff's condition necessarily contradicts the ALJ's findings. His opinion does not preclude the possibility that Plaintiff, though medically disabled, can still perform light work,

which would mean he is not disabled under the Act.  As such, the conclusion reached by Colao that Plaintiff is medically disabled does not necessarily contradict the ALJ's conclusion that he is not legally disabled under the Act, as those two uses of "disabled" are not always synonymous. This distinction is, at any rate, not significant here because the Court finds that there was substantial evidence in the record that outweighed Colao's determination, even if it was that Plaintiff was disabled under the Act.

### 3. The Step-Four Determination

The Commissioner wisely concedes that the ALJ erred when he made the step-four determination that Plaintiff was capable of performing his past work as a warehouse worker. Mot. at 24.  At the August 6, 2009, hearing, vocational expert Tanja Hubacker testified that Plaintiff's past relevant work required medium levels of exertion.  AR at 657.  Given the ALJ's determination that Plaintiff's RFC was limited to either light exertion or sedentary work, a finding that Plaintiff could return to a job that required medium exertion was likely against the substantial weight of the evidence.  Because the ALJ made an alternative step-five determination, his error here is harmless.

### 4. The Step-Five Determination

The ALJ, in addition to finding in step four that Plaintiff could resume warehouse work, also ruled in the alternative.  He held in step five that even if Plaintiff could not do warehouse work, he was nonetheless capable of "making an adjustment to other work" based on his RFC, age, education, and work experience, as required by § 416.920(a)(4)(v).  AR at 29-31.  The Commissioner bears the burden of proof at this step and easily satisfies that burden with the evidence supplied by the vocational expert Hubacker.  She testified that a significant number of jobs exist in the national economy for a person of Plaintiff's profile – namely, a high-school-

educated unskilled worker of Plaintiff's age and physical limitations. See id.; AR at 678-80. The step-five determination is thus supported by substantial evidence.

    B.  New and Material Evidence

In arguing that the Commissioner erred on the disability determination, Plaintiff also presents additional evidence that he presumably believes the ALJ did not review. See Suppl. Compl. 1-16; Plaintiff's "Civil Statement," ECF No. 16 at 2-11 (Stmt.). Section 405(g) of the Social Security Act, however, does not authorize a reviewing district court generally to consider additional evidence. See Mathews v. Weber, 423 U.S. 261, 270 (1976) ("under . . . 42 U.S.C. § 405(g), neither party may put any additional evidence before the district court"). Sentence six of § 405(g) does, however, permit district courts to "order additional evidence to be taken before the Commissioner . . . but only upon a showing that there is [1] new evidence [2] which is material [3] and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Defendant correctly points out that Plaintiff's additional evidence can at best be treated as an implicit argument for remand on the basis of new and material evidence. Mot. at 9. But none of the three criteria for remand is satisfied here.

First, almost all of Plaintiff's extra-record evidence – mostly an odd hodgepodge of old records – is not new. Plaintiff submits the following documents that are already present in the administrative record: (1) a report from Dr. Mathews dated August 14, 2003, Supp. Compl. at 8; Stmt. at 6; AR at 424; (2) a second report from Dr. Mathews dated August 28, 2003, Supp. Compl. at 6; Stmt. at 5; AR at 423; and (3) a third report from Dr. Mathews dated September 11, 2003, Supp. Compl. at 9; Stmt. at 4; AR at 422. As these documents are present in the record and indeed cited by the ALJ in his opinion, AR at 24, they are by no means new.

Four other documents were created prior to Plaintiff's August 6, 2009, ALJ hearing and are thus also not new: (1) a July 5, 2002, list of the doctors who examined Plaintiff in the 1990s, Supp. Compl. at 13-16; (2) a February 13, 2003, letter from Plaintiff to the Appeals Council seeking to have an earlier SSI application reviewed, id. at 2-5; (3) an October 20, 2005, certificate of compliance, id. at 12; and (4) a January 12, 1998, letter from a Dr. Paul Katz summarizing the outcome of Plaintiff's 1997 and 1998 visits to him. Stmt. at 2-3. Section 405(g)'s newness requirement is satisfied only when the additional evidence that the claimant seeks to have considered was "not in existence or available to [him] at the time of the administrative proceeding." Sullivan v. Finkelstein, 496 U.S. 617, 626 (1990). The four documents stated above were created long before the administrative hearing and were thus readily available to him. Perhaps because his then-attorney rightfully saw no value in adding these documents to the administrative record, they were left out. Plaintiff, at any rate, proffers no reason for his failure to present them to the ALJ, and he cannot now claim they represent new evidence.

Second, the remaining arguably new documents are not material within the meaning of § 405(g), which requires that the claimant show that the additional evidence he seeks to have considered "might have changed the outcome of the prior proceeding." Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991). The documents are as follows: (1) an undated letter from Dr. Colao, Supp. Compl. at 7; (2) a handwritten note dated August 10, 2011, which seems to come from the office of Dr. Colao, Stmt. at 9; (3) an indecipherable and unsigned handwritten note dated August 26, 2010, which seems to come from the office of Dr. Mathews, Supp. Compl. at 10; Stmt. at 7; (4) another indecipherable and unsigned handwritten note dated September 16, 2010, which seems to come from the same office, Supp. Compl. at 11; Stmt. at 8; and (5) a psychiatric

evaluation of Plaintiff from the Hillcrest Children and Family Center dated August 24, 2010. Stmt. at 10-11.  Needless to say, these records could hardly have changed the outcome in this case.

Both the undated letter from Colao and his short handwritten note merely restate his diagnosis, which is already more than adequately represented in several documents in the record. If the ALJ was not moved to change his findings based on formal statements of Colao's diagnosis, then a handwritten note and an undated letter stating the same diagnosis would certainly have not convinced him otherwise.  Also, the handwritten notes from Mathews's office are, as stated, indecipherable to the Court.  To the extent, however, that Defendant is a better decoder than the Court and is able to understand the handwritten notes, they are not material. Defendant states that the notes "reference Plaintiff's March 1991 accident and MRI results . . . that Dr. Mathews had reviewed and discussed . . . in 2003" and "state[] that Plaintiff's complaints had not changed and that, under the opinion of Dr. Colao, Plaintiff is disabled."  Mot. at 13.  These statements would not have changed the outcome of this case because they reflect facts that are already present in the record.  See AR at 422-24.

Additionally, the August 24, 2010, psychiatric evaluation of Plaintiff would not have changed the outcome because it did not conclude that Plaintiff suffered from mental impairments that are disabling under the Social Security Act.  Nor did it reveal that Plaintiff, as required by Listing 12.04, is markedly restricted in "activities of daily living," "social functioning," "maintaining concentration, persistence, or pace," or that he has experienced "repeated episodes of decompenstion, each of extended duration."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  As such, there is nothing in the psychiatric evaluation that, if considered by the ALJ, would likely have caused him to alter his conclusion that Plaintiff's mental impairments did not amount to a

disability under the Social Security Act. The Court, therefore, will not remand the case on the basis of this evidence.

## IV.   Conclusion

Because the ALJ could properly determine, based on substantial evidence found in the record, that Plaintiff was not disabled under the Social Security Act, and because Plaintiff's extra-record evidence is neither new nor material, Defendant's Motion for Judgment of Affirmance will be granted. A separate Order consistent with this Memorandum Opinion will issue today.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: March 19, 2012